[No. 13666.  Department One.  May 29, 1917.]

WILLIAMSON INVESTMENT COMPANY, *Appellant*, v. MABEL C.
WILLIAMSON, *Respondent*.[1]

PARTITION—DIVISION OR SALE—PRESUMPTIONS—BURDEN OF PROOF.
Under Rem. Code, § 838, authorizing a sale in partition proceedings
only where it appears that a partition cannot be made "without
great prejudice" to the owners, there is a presumption that property
held in common may be equitably divided and the burden to show
prejudice rests upon him who asserts it.

SAME—SALE OR DIVISION—"GREAT PREJUDICE"—STATUTES.  "Great
prejudice," in Rem. Code, § 838, authorizing a sale in partition pro-
ceedings, means material pecuniary loss; so that the destruction of
an old shell of a building of negligible value on a city lot worth
from $20,000 to $37,000 would not be "great prejudice" in the legal
sense.

ADJOINING LANDOWNERS—REMOVAL OF BUILDING — SUPPORT — LIA-
BILITY.  In the absence of a party-wall agreement, an owner may
remove his building without building a wall to sustain an adjoining
connected building, upon notifying the adjoining owner to protect
his own building, and is liable only for failure to exercise ordinary
care.

PARTITION—DIVISION OR SALE—"GREAT PREJUDICE"—EVIDENCE.  The
fact that to divide a city lot would reduce its aggregate value from
ten to thirty per cent does not amount to "great prejudice" author-
izing a sale in partition proceedings where it appears that even a
greater loss would result from a sale on the existing market; and
the fact that property cannot be sold without loss is a sufficient rea-
son to divide it in specie.

APPEAL—REVIEW—FINDINGS.  Findings upon conflicting opinion
evidence, while not binding on appeal, are entitled to great weight,
especially when supported by the report of referees.

APPEAL—REVIEW—HARMLESS ERROR.  Error in the view that
neither party to a partition suit could bid at a sale is immaterial
when no sale was ordered.

PARTITION—REFEREE—OBJECTIONS—WAIVER.  In partition proceed-
ings, complaint cannot be made that one of the referees to make a
partition in kind was a witness in the original case, where the fact
was known when he was appointed and no objection was made at
that time.

[1]Reported in 165 Pac. 385.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered December 8, 1915, in favor of the defendant, confirming the report of referees establishing a division of real estate by partition. Affirmed.

*Voorhees & Canfield,* for appellant.

*Wellington D. Rankin* and *Sam H. Cone,* for respondent.

ELLIS, C. J.—This is an action for partition. The question is whether the land should be sold or divided in kind.

The property is described as lot 20, block 8, Havermale's addition to Spokane Falls, now Spokane. It is located on the north side of Main avenue, between Brown and Barnard streets, in the business district of the city. It has a frontage of fifty feet on Main avenue and a depth of ninety feet to the north. It is owned in undivided moieties by the parties to this action as tenants in common. It is adjoined on the east by lot 21, of the same dimensions and in the same block. Many years ago the then owner of lot 20 and the then owner of lot 21 erected a two-story wooden building covering both lots. The building had a common entrance on the line between the two lots giving access to the second story. Sixteen years ago, Volney D. Williamson, president of the plaintiff corporation, became the owner of lot 20, and another owner acquired lot 21. The building was an old building at that time. A few years later, the common entrance was closed and a wooden partition wall cutting the original building into two was run through on the line between lots 20 and 21. Thereafter the two buildings were operated as separate buildings, the main entrance to that on lot 20 being placed in the middle of the Main avenue or front wall with a stairway leading to the second story. The ground floor consists of two storerooms. The upper floor is fit only for a cheap rooming or lodging house. The upper hallway, office, laundry and rooms are so arranged that a partition and double stairway could not be run through on the middle line of lot 20

so as to make two separate buildings without prohibitive expense.

At the time of the trial, the west storeroom was rented for a small monthly rental. The other storeroom was vacant. The upper story was rented at a monthly rental of about $40. It is admitted that the income from the building is hardly sufficient to carry the taxes and insurance, and that the rent is being continually reduced in order to keep the building tenanted at all. Three of plaintiff's witnesses somewhat indefinitely valued the building at from $1,500 to $3,000, though all of them admitted that it added little or nothing to the value of the lot, and that its only value was as an aid in carrying the property till the lot shall be used by the erection thereon of modern improvements as business property. Two witnesses for defendant and the three referees in partition appointed by the court testified that the building had little or no value, and, in substance, that the property would sell as readily, and for as much, without the building as with it. From the whole evidence, it is plain that the building is an old wooden shell, badly out of repair and not worth repairing. Props have been placed in the rear, presumably to keep it from falling. On the part of the city officials, there have been threats, or at least talk, of condemning it. One of the referees, a practical contractor and builder of forty years' experience, who said he had examined the building critically, testified as follows:

"As a matter of fact this property can be partitioned without any great prejudice to the owners. I do not consider the building of any value. I will have to answer that way. If it was a good building I would say it hurts it. But I consider the lot as though the building was not there. Independent of the question of the times it would not be any great prejudice to cut the lot in two, not particularly, but then as a rule you can sell 50 feet better than you can 25 feet, but there is no great detriment on that property because very often some one wants 25 feet, but I prefer 50 feet myself. That would be owing to the buyer. As to the con-

dition of the building, can the stenographer spell 'rotten'? It is in bad shape. It is gradually rotting down. The back timbers or studding are all rotten on the bottom. They put these braces up for fear it might fall—these braces on the back. I don't know if it would fall, but it looks bad. The plumbing is in bad shape. They do not use the bath room at all; they use the sink and toilet; and the plastering is all broken down, and lathing exposed, and paper and all off, and I would think the building was ready to be condemned, myself; I think it's worthless."

As to the value of the lot, one of plaintiff's witnesses, an architect, expressed the opinion that it was worth, at the time of the trial, about $20,000; that he thought there was then a market for it at that price; that the real estate market was then much depressed, and that, in normal times, he would consider· $600 a front foot, or $30,000, a good price. He expressed the further opinion that to cut the lot in two would reduce the aggregate value by twenty-five per cent to thirty per cent. Another of plaintiff's witnesses, an experienced real estate man, was of the opinion that a high or boom price for the lot would be $60,000, a low or "hard times" price $22,000, and the normal value $30,000; that to cut the lot in halves would reduce the aggregate value by ten per cent. When asked, in substance, which would result in greater loss to the owners, to divide the property in kind or sell it on the present market, he said it would be a "toss up" as to which would be advisable, and that "assuming that one could wait till normal times . . . it would be more prejudicial to sell than to divide." Still another witness, an architect not acquainted with real estate values in Spokane, expressed the view that a division in kind would depreciate the aggregate value by about twenty per cent. Another real estate dealer placed the values higher, and the loss by division at about thirty-three per cent. He also placed the market value at the time of trial more than one-third below normal value. Of defendant's witnesses, one, a real estate dealer of long experience, was of the opinion that the prop-

erty could not be sold at the time of the trial for more than thirty per cent to fifty per cent of its ordinary normal value. Another experienced real estate agent, who has had this property in his charge for about three years, while not expressing himself in terms of percentage, was of the positive opinion that the property could not be sold to advantage on the depressed market existing at the time of trial, and he said, "As far as that particular property is concerned, I would rather have half of it all my own than to have it sold and take half of the money at this time." An experienced contractor and builder, who was also one of the referees afterwards appointed by the court to partition the property, who had had thirty years' acquaintance with conditions and relative real estate values in Spokane, stated that he would not sell real estate at this time unless forced to do it; that it could not be done without considerable loss, which in some cases might run as high as seventy per cent.

The trial judge was of the opinion that the building was of little or no permanent value to the property, and that the fact that it could not be advantageously divided should not be permitted to stand in the way of a partition in kind. He found that the property could be divided into equal parts without great prejudice, or any substantial prejudice, to either of the owners, and that it should be so divided and partitioned between the parties without a sale. He accordingly entered an interlocutory decree of partition, appointing three duly qualified and disinterested persons to make the partition, and directing, if they were unable to partition and assign to each of the parties an equal portion, quantity and quality relatively considered according to their respective rights, without great prejudice to the parties respectively, that they make and file a report to that effect.

The referees accordingly partitioned the property, reporting that they had done so without great prejudice to either of the parties, by dividing it into two equal portions, quantity and quality relatively considered, by drawing a straight

line from the center point of the north line of the lot to the
center point of the south line, and that they had assigned the
west half to defendant and the east half to plaintiff. Plaintiff
filed exceptions to this report and contested its confirmation.
After a full hearing, the court entered its final decree con-
firming the partition as made by the referees. Plaintiff ap-
pealed.

Both parties concede that the sole question for the court's
determination was whether or not a partition in kind could
be made without great prejudice. The appellant through-
out took, and still takes, the negative of this issue, and re-
spondent the affirmative. It is obvious that every case of
this character must ultimately depend upon its own peculiar
facts. For that reason we have endeavored to set out fairly
and fully the purport of the evidence. There are, however,
certain broad guiding principles which it may profit to notice.

Where, as here, there are no complications as to the title
of either party, either of the tenants in common can demand
partition as a matter of right. Freeman, Cotenancy and
Partition (2d ed.), § 424; *Moss v. Nye*, 183 Ala. 544, 62
South. 776. Probable injury to the property, inconvenience
or hardship to either of the parties are not adequate barriers
to the assertion of the right, nor valid excuses for material
delay in according the remedy. *Wittel v. Wittel*, 82 N. J.
Eq. 229, 91 Atl. 722; *Mylin v. King*, 139 Ala. 319, 35 South.
998.

In the original jurisdiction of equity there was no such
thing as partition by means of sale, except where all parties
were *sui juris* and consenting. Wanting such capacity and
consent, the division was always in kind, and where the land
was incapable of exact or fair division, compensation for the
inequality was made by an award of "owelty of partition."
4 Pomeroy, Equity Jurisprudence (3d ed.) §§ 1389, 1390.

The practical inconvenience and frequent inadequacy of
this method led to the enactment in England, and in nearly
all of the states of the Union, of statutes conferring upon the

courts power to make partition by sale of the land, when not partible in kind without greater injury than a sale would cause, independently of the consent of the parties. But partition has not lost its original purpose of a division without changing the existing character of the inheritance. The courts still, as formerly, favor a division in kind whenever practicable. 4 Pomeroy, Equity Jurisprudence (3d ed.), § 1390.

"The law favors partition of land among tenants in common rather than a sale thereof and a division of the proceeds, and it is only when the land itself cannot be partitioned that a sale may be ordered." *Kloss v. Wylezalek*, 207 Ill. 328, 69 N. E. 863, 99 Am. St. 220.

It is still recognized that an owner has the right to retain his inheritance or investment in the form in which he has it, so long as it can be done without great prejudice to his cotenant.

"The power to convert real estate into money against the will of the owner, is an extraordinary and dangerous power, and ought never to be exercised unless the necessity therefor is clearly established." *Vesper v. Farnsworth*, 40 Wis. 357.

Nearly all of the state statutes, of which that of this state is typical, therefore, condition the power of the court to order a sale upon a finding from evidence that partition in kind cannot be made without "great prejudice" to the owners. Our statute, Rem. Code, § 838, authorizes actions for partition of property, "and for sale of such property, or a part of it, if it appear that a partition cannot be made without great prejudice to the owners." And again, § 845 declares:

"If it be alleged in the complaint and established by evidence, or if it appear by the evidence without such allegation in the complaint, to the satisfaction of the court, that the property, or any part of it, is so situated that partition cannot be made without great prejudice to the owners, the court may order a sale thereof, and for that purpose may appoint one or more referees. Otherwise, upon the requisite proofs being made, it shall decree a partition according to

the respective rights of the parties as ascertained by the court, and appoint three referees therefor, and shall designate the portion to remain undivided for the owners whose interest remain unknown or are not ascertained."

Construing a statute couched in terms not materially different from ours, an able court has held that the term "great prejudice to the owners" means material pecuniary loss. The court said:

"So the established test of whether a partition in kind would result in 'great prejudice to the owners' is whether the value of the share of each in case of a partition would be materially less than his share of the money equivalent that could probably be obtained for the whole." *Idema v. Comstock*, 131 Wis. 16, 110 N. W. 786, 120 Am. St. 1027.

See, also, to same effect, *Vesper v. Farnsworth, supra.*

The supreme court of appeals of West Virginia has clearly expressed what we conceive to be fundamental guiding principles in all cases, though the statute there involved made the criterion "convenience" instead of great prejudice. That court said:

"In any case such sale may be made if the parties are all adults and consent thereto. But the court has no right to decree a sale without their consent, unless it finds, first, that partition in kind cannot be conveniently made; and, second, that the interests of the parties owning the land will be promoted by a sale. These two requisites are conditions imposed by the statute, which alone confers upon a court of equity the power to make a sale at all. They are important and indispensable conditions. The statute is an innovation upon the common law, taking away from the owner the right to keep his freehold, and converting his home into money. That must not be done except in cases of imperious necessity. It is a legislative alteration of a canon of the law which forms part of the sub-structure of our jurisprudence. Forcible conversion of property into money is avoided wherever possible." *Croston v. Male*, 56 W. Va. 205, 49 S. E. 136, 107 Am. St. 918.

See, also, *Roberts v. Coleman*, 37 W. Va. 143, 16 S. E. 482. Pomeroy (section 1390) expresses the same thought

when he says the power of sale is to be exercised "whenever it shall appear to the court . . . that a sale would be more beneficial, or less injurious, than an actual division."

Since, by the statute itself, the power of the court to order a sale is conditioned upon a showing that great prejudice would result from a division, there is a presumption that land held in common can be equitably divided according to the interests of the parties, measured by value. The burden of proof to show great prejudice, therefore, rests upon him who asserts it. *East Shore Co. v. Richmond Belt Ry.*, 172 Cal. 174, 155 Pac. 999; *Mitchell v. Cline*, 84 Cal. 409, 24 Pac. 164; *Hellier v. Syck*, 147 Ky. 762, 145 S. W. 1110; *Idema v. Comstock, supra.*

In the case before us, the burden to show that great prejudice would result from division in kind was upon the plaintiff. In the light of the foregoing well established principles, has this burden been adequately met?

It is first urged that, because the building cannot be advantageously divided, to divide in kind amounts to an order for a destruction of the building, or for the construction of a wall on the dividing line at a cost greater than the value of the building, and that either alternative works great prejudice. But great prejudice means material pecuniary loss, not mere temporary inconvenience or temporary impairment of an income slight in comparison with the value of the property for the uses for which it is suitable. The question is, should this property, in view of its suitable location for business purposes, be treated as permanently improved property would be treated? It seems to us that, where a property worth on a depressed market $20,000 to $22,000, and on a normal market $30,000 to $37,000, is renting for only $40 to $50 a month, and precariously at that, since the evidence shows continual reductions in rent to keep it tenanted at all, it cannot be said to be permanently improved, nor improved at all in any real or controlling sense.

The building is an old wooden shell, so out of repair that it has been propped for safety, the plumbing is antequated and out of repair, the plastering is off, the lathing is exposed. It is not worth repairing. The court in his findings gave it a value of about $1,000, but we think the evidence shows this valuation excessive by at least one-half. One cannot read the evidence without being impressed with the view of many of the witnesses that the lots would be worth as much without it as with it. On the facts, we agree with the trial court and the referees that this building as an element of value is negligible. The property should be treated for the purpose of division as if it were not there. Its absolute destruction would not be great prejudice in the legal sense of material pecuniary loss.

The further claim, that the building on lot 20 cannot be removed without entailing upon the owner of the east half of it the expense of building a wall to sustain the building on lot 21 adjoining it on the east, is not supported either by the law or by the preponderance of the evidence. The evidence fails to show that there was ever a continuing party wall agreement of any kind. If there was any, the burden was upon appellant to show it. We must assume that there was none. In such a case, the only duty of either party who desires to remove his building is to notify the other of that intention so that the other may do whatever he deems advisable to protect his own building. Thereafter the first party is only liable for a failure to exercise reasonable care in removing his structure. *Clemens v. Speed*, 93 Ky. 284, 19 S. W. 660, 19 L. R. A. 240; *Hieatt v. Morris*, 10 Ohio St. 523, 78 Am. Dec. 280. No law to the contrary is cited, and we know of none as applied to the facts here presented. That no such support would be necessary in any event, we think is supported by a preponderance of the evidence. Two of the referees testified that the dividing wall was a double wooden wall. One of them, who seems to us probably the best qualified witness who testified in the case, said:

· · "I am a builder and contractor. It is two buildings that were built on lots 20 and 21. They are two buildings. There are two separate supports there. I examined it critically when I was there. There were two six-inch walls. The wall is a foot thick. I went into the dark room and could see through the partition. It is a window they put through there. Evidently there is a vent there at the top. The building could be removed from the east half without furnishing any support for the building lying on lot 21."

The evidence to the contrary was vague and uncertain.

It is next urged that to divide the lot would reduce the aggregate value of the halves from ten per cent to thirty per cent below its value as a whole, and that this would be great prejudice. Assuming that this is true, though respondent's witnesses could see no such excessive result, the fact remains that every one of appellant's witnesses who testified on the subject was just as positive that even a greater loss would result from a sale on the existing market, and on this point there was an absolute unanimity of opinion on the part of all the witnesses on both sides. To use the language of Pomeroy, can such a sale be justly said to be "more beneficial, or less injurious, than an actual division"? Simply because the aggregate value of the halves would be somewhat less than the value of the whole, must the law on that account force one, or possibly both, of the common owners to change the form of his holding, a thing never favored in law, and forego the value of his investment by selling the entire property at a sacrifice? We think not. But it is argued that the evidence as to the present depressed condition of the real estate market and a probable advance of this land in value was inadmissible and purely speculative. We fail, however, to see that it was more so than the evidence of loss in value by a division. Both are matters of opinion, and opinion evidence is always admissible on questions of value. In *Craighead v. Pike*, 58 N. J. Eq. 15, 43 Atl. 424, Vice Chancellor Pitney, now associate justice of the supreme court of the United States, gave to evidence of this character a controlling

weight. He held that the fact that the property as a body had been on the market for a long time and could not be sold except at great loss was a sufficient reason to divide it *in specie.*

After all, the question of value in partition suits, as in other cases where it enters, is one resting largely in opinion. The question whether the division of a given piece of property, which is capable of exact division, will result in greater loss than a sale is, in almost every case, essentially a question of opinion. The witnesses in this case were practically at one in the opinion that the building was of little or no moment as an incident of value to this property, either in halves or as a whole. As to the aggregate value of the two halves as compared with the value as a whole, they were hopelessly divided. The trial court and the three referees were obviously of the opinion that the difference was slight, since the court found, and the referees reported, that a division in kind could be made, as it was made, without prejudice. Though the trial here is one *de novo* and the findings of the trial court are not binding upon us (Rem. Code, § 1736), they are nevertheless entitled to great weight. This is especially true when, as here, they are supported by the report of the referees. Freeman, Cotenancy and Partition (2d ed.), § 525; *Lang v. Constance,* 20 Ky. Law 502, 46 S. W. 693; *Garth's Guardian v. Thompson,* 24 Ky. Law 1961, 72 S. W. 782; *Parrott v. Barrett,* 81 S. C. 255, 62 S. E. 241. On the whole record, we are unable to say that the court's findings are contrary to the preponderance of the evidence.

In the course of the trial, the trial judge expressed the view that, if he ordered a sale, he should not permit either party to the suit to become a bidder at the sale. In this he was in error, but the error is wholly immaterial, since no sale was ordered. Whether that view influenced him to favor a division in kind can make no difference. Under the law, it was his duty to favor such a division in any event, since

the evidence showed the division practicable and failed to show that great prejudice would result from it.

Some complaint is made of the fact that one of the referees was also a witness at the original hearing. As an objection this is wholly untenable. *Garth's Guardian v. Thompson, supra; Hellier v. Syck, supra.* This fact was known when he was appointed, and no objection was made at the time. Moreover, all of the referees were men of unquestioned standing, and all testified that they were not influenced by the court's decree in reaching the conclusion that the property should be divided.

The decree is affirmed.

MORRIS, FULLERTON, MAIN, and CHADWICK, JJ., concur.